☐ Original       ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information about the location of the cellular telephones assigned call<br>number (414) 345-7827, (the "Target Cell Phone"), subscribers unknown.<br>The service provider for the Target Cell Phone is Verizon Wireless ("Service<br>Provider"), a wireless telephone service provider headquartered at 1095<br>Avenue of the Americas; New York, NY. 10036 | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br>22-841M(NJ)<br>**Matter No. 2022R00039** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___3/2/22___ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon Nancy Joseph_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of ___02/04/2023___ .

Date and time issued:   ___2/16/22 @ 3:06 p.m.___          *Nancy Joseph*
                                                                                    *Judge's signature*

City and state:   ___Milwaukee, Wisconsin___          ___Hon. Nancy Joseph, U.S. Magistrate Judge___
                                                                                    *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**Matter No. 2022R00039**

1.      Records and information associated with the cellular devices assigned call number call number **(414) 345-7827**,  (referred to herein and in Attachment B as "the Target Cell Phone") whose listed subscribers are unknown, that is in the custody or control of Verizon (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas; New York, NY. 10036..

2.      Target Cell Phone.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter No. 2022R00039**

**I.      Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

   a.   The following subscriber and historical information about the customers or subscribers associated with Target Cell Phone for the time period from August 1, 2021 to present:

      i.   Names (including subscriber names, user names, and screen names);

      ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii.   Local and long-distance telephone connection records;

      iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

      v.   Length of service (including start date) and types of service utilized;

      vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

      vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

      viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of TCP-1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government

shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1) involving James A. Davis, LaJuan J. GRAHAM, Juiquin Pinkard and other unknown individuals since August 1, 2021.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Information about the location of the cellular telephones assigned call number (414) 345-7827, (the "Target Cell Phone"), subscribers unknown. The service provider for the Target Cell Phone is Verizon Wireless ("Service Provider"), a wireless telephone service provider headquartered at 1095 Avenue of the Americas; New York, NY. 10036 | ) Case No.  22-841M(NJ) ) ) **Matter No. 2022R00039** ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. Over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❑ contraband, fruits of crime, or other items illegally possessed;
- ❑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 84(a)(1) and 846 | Distribution and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with the intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 02/04/2023 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ANDREW MATSON (Affiliate)                    Digitally signed by ANDREW MATSON (Affiliate)
                                             Date: 2022.02.16 14:35:16 -05'00'

*Applicant's signature*

DEA TFO Andrew Matson

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means)*.

Date:  2/16/22

*Judge's signature*

City and state:  Milwaukee, Wisconsin

Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT
## MATTER NO. 2022R00039

I, Andrew Matson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephones assigned call number **(414) 345-7827,** (the "Target Cell Phone"), subscribers unknown.  The service provider for the Target Cell Phone is Verizon Wireless ("Service Provider"), a wireless telephone service provider headquartered at 1095 Avenue of the Americas; New York, NY. 10036. The Target Cell Phone are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing,

routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone.

4.    I am a Task Force Officer with the Drug Enforcement Administration, (DEA) and have been since February 2021.  Before that, I was employed as a police officer with the Racine Police Department in Racine (RAPD), Wisconsin, where I spent the last 4 years as a Detective in the Special Investigations Unit (SIU) assigned to the Drug Enforcement. During my tenure as a police officer, I have been involved primarily in the investigation of large-scale drug traffickers operating not only in the City of Racine and the State of Wisconsin, but also throughout the southeastern Wisconsin.  As a member of the DEA I have worked investigations directly in the City of Milwaukee and the State of Wisconsin as well as the entire United States based upon the direction of investigations that arise through the Milwaukee District Office of the DEA.

5.    As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, United States currency, and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I

have attended training courses, which specialized in the investigation of drug trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

6.     Based upon my training and experience, as well as information relayed to me during the course of my official duties, I know that a significant percentage of controlled substances, specifically marijuana, cocaine, heroin, and methamphetamine, imported into the United States comes from Mexico and enters the domestic market at various points along the southwest border of the United States, because Mexican cartels control the transportation, sale, and importation of cocaine, marijuana, heroin, and methamphetamine into the United States.

9.     Based on my training, experience, and conversations with other law enforcement officers, I know that distributors of marijuana, methamphetamine, cocaine, heroin, as well as other controlled substances, often used cellular and landline telephones.  Additionally, I know that drug traffickers often change their phone numbers and cellular devices on a frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identities. I know that these individuals often use code words to discuss controlled substances and methods of concealing controlled substances while talking on the telephone. I know that drug traffickers often conduct extensive counter-surveillance to avoid law enforcement detection.

10.     Based upon training and experience, I know that narcotics-trafficking and money-laundering organizations routinely used several operational techniques to sustain their illegal enterprises. These practices are designed and implemented to achieve two paramount goals: (1) the successful facilitation of the organization's illegal activities, including the importation and

distribution of controlled substances, and the subsequent repatriation of the proceeds of that illegal activity; and (2) the minimization of the exposure of coconspirators, particularly those operating in leadership roles, from investigation and prosecution by law enforcement. More specifically, based on my training and experience, I know the following:

a. Sophisticated drug-trafficking organizations routinely compartmentalize their illegal operations. The compartmentalization of operations reduces the amount of knowledge possessed by each member of the organization. This method of operation effectively minimizes the potential damage an individual cooperating with law enforcement could inflict on the organization and further reduces the adverse impact of a particular law enforcement action against the organization.

b. Members of these organizations routinely used communications facilities, such as cellular telephones, to communicate directions and information about the organization's illegal activities to other organization members.

c. During the course of these telephonic communications, organization members routinely use coded references and encryption in an effort to elude law enforcement detection.

d. The communication of time sensitive information is critical to the successful conduct of these organizations' illegal activities. The critical nature of this information stems from the necessity of the organization's leadership to provide direction for the importation and distribution of narcotics, and the subsequent laundering of the proceeds of those illegal activities.

e. Drug traffickers and the money launderers associated with them often confine their illegal telephonic communications to long-trusted organizational members and other high-level narcotics traffickers in an attempt to evade law enforcement and circumvent narcotics investigations; and

f. Drug traffickers routinely use fictitious names or other individuals to register pagers, telephones, vehicles, real property, and utility services to avoid detection by law enforcement.

7. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence

has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     Based on the facts set forth in this affidavit, there is probable cause that the possible crimes of distribution and possession with intent to distribute controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances, violation of 21 U.S.C. §§ 841(a)(1) and 846, have been committed by James A. Davis, DOB: XX/XX/1983, LaJuan J. GRAHAM, DOB: XX/XX/1983, Juiquin Pinkard, DOB: XX/XX/1984 and other unknown persons, collectively identified to the Drug Trafficking Organization (DTO). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

**JURISDICTION**

10.    The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

11.     The United States, including, DEA, is conducting a criminal investigation into James A. Davis and LaJuan J. GRAHAM, Juiquin Pinkard and other unidentified subjects for possible violations of 21 U.S.C. §§ 841(a)(1) and 846.

12.     In December 2021, I was contacted by Detective David Rybarik of the Racine Police Department.  Detective Rybarik is assigned to the Special Investigations Unit – Gang Enforcement.  Detective Rybarik stated he received information from a confidential source (CS) indicating that since at least August 2021 James A. Davis, DOB: XX/XX/1983, was trafficking controlled substances, specifically heroin in southeastern Wisconsin, more specifically in Milwaukee County and Racine County in the State of Wisconsin.

13.     Detective Rybarik stated CS provided information related to James A. Davis.  CS stated Davis lives in Milwaukee, Wisconsin.  CS stated they could purchase large amounts of heroin directly from Davis.  CS did not know specifically where Davis resides in Milwaukee, Wisconsin.  CS stated Davis drives a white colored Audi Q7.  Further CS stated often Davis will conduct his illegal drug transactions with the use of rental vehicles.

14.     CS information is credible and reliable because CS is providing information based on CS personal knowledge and observations and said information has been corroborated by other sources during this investigation and supported by surveillance and call detail records.  CS is cooperating for consideration on several Bail Jumping, Operating While Intoxicated (OWI) and Operating While Revoked (OAR) offenses. CS has a felony conviction for Manufacturing / Deliver Heroin and multiple misdemeanor convictions for Resisting / Obstructing an Officer, OWI and shoplifting.

15.     Based on CS indicating they could purchase heroin from Davis, members of DEA and members from Racine Police Department – SIU conducted a controlled purchase of 25 grams of heroin from Davis.

16.     The controlled purchased took place on January 14, 2022.  During the operation CS made contact with Davis at phone number (262) 888-0716 to coordinate the controlled purchase of 25 grams of heroin for $1750.  The location of the buy was initial scheduled to occur in Racine, Wisconsin.  Davis sent CS a text message from (262) 888-0716 requesting CS travel to 2030 N. 31 Street, Milwaukee, WI 53208 to pick up the heroin.

17.     Once the controlled buy was set up CS and CS's vehicle was searched by assisting case agents and no drugs, money, or weapons were located by case agents.  CS was provided with $1750 of buy money. CS was also provided with audio-/video-recording/transmitting device. CS was under constant surveillance as they travelled to 2030 N. 31st Street, Milwaukee, WI 53208.

18.     Once at the location CS made physical contact with Davis inside CS's vehicle. Davis informed CS "his guy" was on his way with the heroin.  After several minutes a vehicle arrived.  DAVIS approached and entered the vehicle.  After a short period of time Davis exited the unidentified vehicle and returned to CS's vehicle with the heroin.  Davis gave CS the heroin and CS gave Davis the $1750 of buy money.  Davis exited CS's vehicle and left the area.  CS was under constant surveillance as they travelled to a predetermined meet location.  Once at the predetermined meet location CS turned over the suspected heroin to the assisting case agent.  Case agents searched CS and CS's vehicle and no drugs, money, or weapons were located by case agents.  Case agents verified CS's statements regarding this controlled drug buy with the audio and video recordings and law enforcement surveillance.   Case agents also confirmed Davis' identity with a drive's license photo from the Wisconsin Department of Transportation (DOT).

19.     The suspected heroin was transported to the Milwaukee District Office for processing.  The controlled substance had a pre and post weight of 25.8 grams.  The substance was tested using NARK II test kit for heroin and fentanyl.  The NARK II test for heroin was negative.  The NARK II test for fentanyl showed a positive presence for the substance.  The controlled substance / fentanyl was packaged and placed into evidence.

20.     During the week after the controlled purchase of fentanyl, Davis and CS had text conversations.  Davis was under the impression that CS was purchasing the heroin for a friend.  Based on Davis impression Davis told CS he could introduce "his guy" to CS's friend so they could deal directly.  Due to the information a second controlled buy was scheduled in which case agents were able to introduce an undercover agent (UC).

21.     The second controlled buy was scheduled for January 26, 2022.  CS made contact with Davis at (262) 888-0716.  Davis agreed to travel to Racine, Wisconsin for the controlled buy.  Prior to the controlled buy CS set up a location in Racine, WI.  Davis agreed to bring his supplier to the deal.  The deal was set for the purchase of 50 grams of heroin for $3500.  Once the location and time of the controlled buy was confirmed CS was searched by assisting case agents and no drugs, money, or weapons were located on CS's person.  CS traveled with UC in an undercover police vehicle to conduct the deal.  UC and CS were under constant surveillance during the operation and each were provided with audio-/video-recording/transmitting devices.

22.     Upon UC and CS arriving at the meet location in Racine, WI, Davis and his supplier entered UC's vehicle.  The supplier was identified as LaJuan J. GRAHAM by using a driver's license photo from Wisconsin DOT.  While in UC's vehicle CS introduced UC to Davis and Davis introduced GRAHAM as "LG".  While in the vehicle GRAHAM passed a bag to UC containing the suspected heroin.  After UC inspected the suspected heroin UC passed $3500 in buy money directly to GRAHAM.  GRAHAM and UC has a short conversation in which they exchanged

cellular phone numbers. GRAHAM provided UC his phone number, which I believed was (414) 840-9739 based review of my notes; however, it was later determined GRAHAM provided number (414) 840-9759 to the UC.

23. After the completion of the controlled buy UC and CS returned to the predetermined meet location. CS was searched buy assisting case agents and no drugs, money, or weapons located were located. UC maintained custody of the suspected heroin.

24. The suspected heroin was transported to the Milwaukee District Office for processing. The controlled substance had a pre and post weight of 50 grams. The substance was tested using NARK II test kit for heroin and fentanyl. The NARK II test for heroin was negative. The NARK II test for fentanyl showed a positive presence for the substance. The controlled substance / fentanyl was packaged and placed into evidence.

25. During the course of the controlled buys assisting agents attempt to assist with conducting post surveillance of Davis and GRAHAM as they left the meeting spot together in a black Ford Fusion with Florida license plate 88ABGR. During the post surveillance the vehicle was lost. The registration on the vehicle used by Davis and GRAHAM on January 26, 2022 listed to Avis / Budget rental company. Records from Avis /Budget indicated GRAHAM rented the Ford Fusion on January 24, 2022.

26. Also during this undercover controlled buy on January 26, 2022, case agents conducted surveillance in the parking lot where the buy occurred. Case agents observed a silver Honda with Illinois registration CU 21390 circling the parking lot. Once the undercover controlled buy was completed, the Honda followed Davis and GRAHAM from the location. An unidentified black male was operating the silver Honda. Case agents later identified this black male as the same black male, Juiquin Pinkard DOB: XX/XX/1984, that provided UC with fentanyl in the

February 10, 2022 undercover controlled drug buy, described below.  Based on my training and experience, the Honda appeared to be conducting counter-surveillance for Davis and GRAHAM.

27.     On January 28, 2022, Davis was stopped by Caledonia Police Department in the same silver Honda with Illinois registration CU 21390, which Pinkard was driving on January 26, 2022.  Caledonia Police Officers also located a white powder substance which later tested positive for cocaine inside the silver Honda.

28.     During the course of the investigation case agents attempted records checks from multiple sources in an attempt to develop possible addressed for Davis and GRAHAM.  The results developed multiple addresses for both Davis and GRAHAM in Milwaukee, WI.  Case agents have conducted surveillance on multiple locations with negative results.

29.     On 02/9/2022, Honorable Judge Nancy Joseph authorized a warrant for electronic surveillance for Davis' and GRAHAM's cellular telephone assigned call number (262) 888-0716 and (414) 840-9739, which were served on their respective providers.  Unfortunately, Verizon notified law enforcement that service to telephone call number (262) 888-0716 was terminated on February 7, 2022, so law enforcement did not execute any electronic surveillance of (262) 888-0716.

30.     Law enforcement obtained subscriber info regarding telephone call number (414) 840-9739 was received and listed to a female in Pewaukee, WI.  Additional electronic surveillance indicated the cellular telephone with call number (414) 840-9739 was connected to a location in Pewaukee, WI.  This data was not consistent with other information regarding investigation as to Davis and GRAHAM, so a follow up interview was conducted with UC.  UC indicated he/she has been communicating with GRAHAM using cellular telephone assigned call number (414) 840-9759.  Based on this information, the electronic surveillance as to (414) 840-9739 was terminated.

31.     On February 10, 2022, case agents conducted an undercover controlled buy for 50 grams of heroin between UC and GRAHAM.  UC verified GRAHAM's number by contacting GRAHAM at (414) 840-9759 via text and phone calls to coordinate the drug purchase.  UC was under constant surveillance during the operation and was provided with audio-/video-recording/transmitting devices. UC went to a Cigo gas station located at 3929 North 49th Street Milwaukee, WI to conduct the undercover controlled.  While UC waited, GRAHAM call UC using telephone number (414) 840-9759.  GRAHAM stated that "his guy" was in the area in a silver Volkswagen.  UC observed a Volkswagen with Ohio registration HST 7153.   Once the UC approached the Volkswagen Pinkard, who was later identified by his DOT driver's license photo, exited the Volkswagen and entered UC's vehicle.  Pinkard told UC he/she would be dealing with Pinkard in Milwaukee but "other dude down there". Based on the previous undercover controlled buy from January 26, 2022, case agents and UC believed Pinkard was referring to either Davis and/or GRAHAM if deal took place in Racine. While in the vehicle Pinkard passed a bag to UC containing the suspected heroin.  After UC inspected the suspected heroin UC passed $3500 in buy money to Pinkard.  After the completion of the undercover controlled buy UC returned to the predetermined meet location and provided the suspected heroin to case agents.

32.     The suspected heroin was transported to the Milwaukee District Office for processing.  The controlled substance had a pre and post weight of 49.9 grams.  The substance was tested using NARK II test kit for heroin and fentanyl.  The NARK II test for heroin was negative.  The NARK II test for fentanyl showed a positive presence for the substance.  The controlled substance / fentanyl was packaged and placed into evidence.

33.     Following the undercover controlled buy from February 10, 2022, case agents utilized a database to determine the registered owner of the Volkswagen with Ohio registration HST 7153.  Case agents learned the Ohio registration HST 7153 was listed to Enterprise rental

company, but to a Ford vehicle not a Volkswagen. Based on my training and experience, I know that drug traffickers will switch license plates in an attempt to thwart law enforcement from tracking vehicles back to themselves in order to conceal their identities.

34.     Law enforcement did review call detail records from Davis' telephone call number 262-888-0716 between December 11, 2021 and January 28, 2022. Davis contacted GRAHAM's cellular telephone assigned call number (414) 840-9759 184 times. Further case agents observed Davis contacted telephone number **(414) 345-7827** 140 times between this time frame also.

35.     Based on this information, case agents review a law enforcement databased and located **(414) 345-7827** being a telephone number utilized by GRAHAM.  Based on surveillance conducted on January 26, 2022 prior to the undercover controlled buy, case agents observed Davis and GRAHAM enter Educators Credit Union located at 6131 West Center Street, Milwaukee, WI. Case agents obtained a federal subpoena for records from Educator Credit Union regarding Davis and GRAHAM.  Educator Credit Union had an account for GRAHAM in which GRAHAM listed his telephone number **(414) 345-7827**.

36.      Case agents utilized a law enforcement databased and identified telephone cellular call number **(414) 345-7827** mobile carrier as Verizon and telephone cellular call number (414) 840-9759 as US Cellular.

37.     Case agents believe GRAHAM is using his call numbers to facilitate communications with known and unknown co-conspirators and sources of supply. Case agents further believe GRAHAM has made and will continue to make frequent visits to locations in which he stores and distribution narcotics for the DTO. Case agents believe that the historical and prospective monitoring of the Target Cell Phone' location will assist in identifying potential sources of supply, distributors, and locations associated with the DTO.  I believe the Target Cell Phone, whose service provider is US Cellular ("Service Provider"), a wireless telephone service

provider, continues to contain valuable information that could be used as evidence for the possible crimes of distribution and possession with intent to distribute controlled substances and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846.

## TECHNICAL BACKGROUND

38.     Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Service Provider's network or with such other reference points as may be reasonably available.

### Cell-Site Data

39.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

40.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a historical and prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

41.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

42.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

43.     Affiant also knows that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical

handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

44.     Based on Affiant's training and experience, Affiant knows that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

45.     Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

## Pen-Trap Data

46.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber

Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## Subscriber Information

47.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

48.     In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify Target Cell Phone' user or users, the locations of that user or users, the patterns of that user or users, and may assist in the identification of other co-conspirators. A frequency analysis of the telephone communications between Davis, GRAHAM, Pinkard and others unknown individuals is material, in that it can establish whether the calls from the Target Cell Phone are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the Target Cell Phone can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether Davis, GRAHAM, Pinkard and others acted-in-concert,

by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## AUTHORIZATION REQUEST

49.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

50.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

51.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.   The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

52.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice till February 2, 2023, pursuant to the Omnibus signed by Honorable Judge Nancy Joseph on February 4, 2022. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce

the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).

53.     As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

54.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**
**Matter No. 2022R00039**

1.      Records and information associated with the cellular devices assigned call number

call number **(414) 345-7827**,  (referred to herein and in Attachment B as "the Target Cell

Phone") whose listed subscribers are unknown, that is in the custody or control of Verizon

(referred to herein and in Attachment B as the "Service Provider"), a wireless communications

service provider that is headquartered at 1095 Avenue of the Americas; New York, NY. 10036..

2.      Target Cell Phone.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter No. 2022R00039**

**I.      Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.  The following subscriber and historical information about the customers or subscribers associated with Target Cell Phone for the time period from August 1, 2021 to present:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long-distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of TCP-1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall

compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1) involving James A. Davis, LaJuan J. GRAHAM, Juiquin Pinkard and other unknown individuals since August 1, 2021.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.